

1  Craig C. Corbitt (83251)
   Michael S. Christian (212716)
2  ZELLE HOFMANN VOELBEL & MASON LLP
   44 Montgomery Street, Suite 3400
3  San Francisco, CA 94104
   Telephone:    (415) 693-0700
4  Facsimile:    (415) 693-0770
   ccorbitt@zelle.com
5  mchristian@zelle.com                  E-filing

6  *Counsel for Plaintiff*

7

8              **UNITED STATES DISTRICT COURT**

9             **NORTHERN DISTRICT OF CALIFORNIA**

10  SCOTT CALDWELL, on behalf of himself and     Case No. 11 1928
    all others similarly situated,
11                                               ) **CLASS ACTION COMPLAINT**
                                                 )
12            Plaintiff,                          ) **JURY TRIAL DEMANDED**
                                                 )
13  vs.                                          )
                                                 )                  **MEJ**
14  NETFLIX, INC.; WAL-MART STORES, INC.;        )
15  and WAL-MART.COM USA LLC,                    )
                                                 )
16            Defendants.                         )
                                                 )
17

18       NOW COMES Plaintiff Scott Caldwell for his Complaint brought under Sections 1 and 2

19  of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Sections 4 and 16 of the Clayton Antitrust

20  Act, 15 U.S.C. §§ 15 & 26, for treble damages and injunctive relief against Defendants Netflix,

21  Inc. ("Netflix"), Wal-Mart Stores, Inc. ("Wal-Mart Stores"), and Wal-Mart.com USA LLC

22  ("Walmart.com").

23       Based upon personal knowledge, information, and belief, and the investigation of counsel,

24  Plaintiff alleges as follows:

25                   **NATURE OF THE ACTION**

26       1.   This suit is brought as a class action pursuant to Rule 23 of the Federal Rules of

27  Civil Procedure on behalf of a plaintiff Class, defined more fully below, consisting of all persons

28  and entities that paid a subscription fee to Defendant Netflix to rent DVDs between May 19, 2005

                            1

1 and the date of class certification (the "Class Period").

2    2.    On or before May 19, 2005, Defendants completed and entered into an illegal

3 anticompetitive agreement (the "Market Allocation Agreement") to divide the markets for sales

4 and online rentals of DVDs in the United States, with the purpose and effect of monopolizing and

5 unreasonably restraining trade, in at least the market for online DVD rentals (the "Online DVD

6 Rental Market"). The mechanics of the Market Allocation Agreement, as set forth herein, allowed

7 Defendant Netflix to charge supracompetitive prices to Plaintiff and other Class members.

8    3.    At the beginning of 2005, Defendants Netflix and Walmart.com were competing

9 directly in the Online DVD Rental Market. Walmart.com viewed its relatively new online rental

10 program, "Wal-Mart DVD Rentals," as a success, expressing considerable optimism about the

11 future growth of the service. In early January 2005, Walmart.com reduced the price of its most

12 popular online DVD rental program, reflecting its plans to expand in that market, which placed

13 further price pressure on Netflix. Facing growing competition from Walmart.com, in January

14 2005, Netflix CEO Reed Hastings invited Walmart.com CEO John Fleming to dinner for a

15 meeting to discuss their (then) competing businesses.

16    4.    Fleming accepted the invitation; that meeting and other communications led to

17 Defendants entering the Market Allocation Agreement, pursuant to which Walmart.com agreed to

18 exit the Online DVD Rental Market and Netflix agreed not to enter the retail DVD market, but

19 instead to actively promote DVD sales by Wal-Mart Stores and Walmart.com.

20    5.    Since entering into the Market Allocation Agreement, neither Wal-Mart Stores nor

21 Walmart.com has rented DVDs online and Netflix has not sold new DVDs. The Market

22 Allocation Agreement served to eliminate all competition (including price competition) between

23 Walmart.com and Netflix in the Online DVD Rental Market, entrench and enhance Defendants'

24 dominant market positions, and otherwise cause harm to competition, including enabling Netflix to

25 charge higher subscription prices for online DVD rentals than it would have had they not entered

26 into the Agreement. Plaintiff and all other similarly situated consumers did in fact pay and

27 continue to pay higher subscription prices to Netflix than they otherwise would have as a result of

28 Defendants' conduct.

2

1

## PLAINTIFF

2       6.      SCOTT CALDWELL is an adult individual who resides in San Francisco,

3   California. During the Class Period, Mr. Caldwell directly subscribed to Netflix for his personal,

4   non-commercial use and paid Netflix fees in connection therewith. The subscription fees Mr.

5   Caldwell paid to Netflix were supracompetitive; they were greater than he would have paid, but for

6   the antitrust violations alleged herein. Mr. Caldwell thereby suffered injury in his property, in the

7   form of overcharges, injury which the antitrust laws are intended to prevent and remedy.

8

## DEFENDANTS

9

## NETFLIX

10      7.      Defendant Netflix is a Delaware corporation headquartered at 100 Winchester

11  Circle, Los Gatos, California, 95032. Netflix is publicly traded on the NASDAQ under the symbol

12  NFLX. Its revenues earned from engaging in interstate commerce exceed \$2 billion annually.

13  Through its website, www.netflix.com, Netflix rents DVDs directly to consumers nationwide by

14  charging monthly subscription fees, which entitle customers to rent DVDs pursuant to various

15  subscription plans. Netflix has possessed a market share of at least 75% of the Online DVD Rental

16  Market in the United States, as defined herein, at all times during the Class Period.

17

## WAL-MART

18      8.      **Wal-Mart Stores.** Defendant Wal-Mart Stores is the largest retailer in the United

19  States. Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street,

20  Bentonville, Arkansas, 72716. Wal-Mart Stores is publicly traded on the New York Stock

21  Exchange under the symbol WMT. Its revenues earned from engaging in interstate and foreign

22  commerce exceed \$400 billion annually. Through its retail stores and its website,

23  www.walmart.com, Wal-Mart Stores sells new DVDs directly to consumers nationwide. Wal-

24  Mart Stores sells far more DVDs than any other retailer in the United States, accounting for about

25  40% of all new DVDs sold to consumers domestically. During fiscal years 2005-2008 combined,

26  it and Walmart.com had revenues in excess of \$25 billion from selling DVDs to consumers. Prior

27  to the Market Allocation Agreement, Wal-Mart Stores' wholly-owned subsidiary Walmart.com

28

3

1  competed with Netflix in the Online DVD Rental Market through the "Wal-Mart DVD Rentals"
2  service, which was available on www.walmart.com.

3      9.    **Walmart.com.** Defendant Walmart.com is a California Limited Liability Company
4  with offices at 7000 Marina Boulevard, Brisbane, California, 94005. Its corporate registration with
5  the California Secretary of State (as of April 8, 2011) lists its address as 702 S.W. 8th St.,
6  Bentonville, AR 72716—the same address as Wal-Mart Stores. It is the online component of Wal-
7  Mart Stores' retail empire that is the leading seller of new DVDs in the United States.

8      10.    Prior to the conspiracy alleged herein, Walmart.com was also a major competitor of
9  Netflix in the Online DVD Rental Market through the "Wal-Mart DVD Rentals" service, which
10  was available on www.walmart.com. While its financials are not publicly reported by Wal-Mart
11  Stores, Walmart.com is ranked as the 14th largest online retailer in the United States.
12  Walmart.com sells new DVDs directly to consumers nationwide. Consumers who purchase DVDs
13  via www.walmart.com may have them either mailed or otherwise delivered to them directly, or
14  may pick them up at a Wal-Mart Stores retail location via Walmart.com's and Wal-Mart Stores'
15  "Site to Store" program.

16      11.    **Wal-Mart Stores and Walmart.com.** Walmart.com and Wal-Mart Stores are, in
17  essence, operated as a single commercial enterprise and hold themselves out to the public as such,
18  by which Walmart.com is an internet sales channel for Wal-Mart Stores, rather than being an
19  independent business entity. Wal-Mart Stores is the registrant of the www.walmart.com domain
20  name that is used to sell products and services by Walmart.com. Likewise, Wal-Mart Stores is the
21  registrant of www.walmartdvdrentals.com. Wal-Mart Stores' then-Chief Marketing Officer John
22  Fleming explained the relationship between Wal-Mart Stores and Walmart.com as follows:

23      Walmart.com was set up as a separate company, with outside investors and with
    Wal-Mart owning a majority. The idea was that Walmart.com was going to tap into
24      customers Wal-Mart didn't have and, in doing so, would defend our position as the
    world's largest retailer. We saw very quickly that this wasn't how customers
25      viewed the online channel. Within six months, Wal-Mart bought back the outside
26      interest.

27      12.    **Wal-Mart Stores' Active Participation in the Conspiracy.** Wal-Mart Stores was
28  actively involved in the conspiracy alleged herein, as alleged more specifically below. For

4

1  purposes of these allegations, both Wal-Mart Stores and Walmart.com are active participants in the
2  conspiracy and each is liable for the unlawful conduct alleged herein, with each, among other
3  things, participating in, and benefiting from, the Market Allocation Agreement. Moreover, Wal-
4  Mart Stores directed, ratified, approved, supported, and otherwise aided and abetted
5  Walmart.com's violations of law.

6       13.    Wal-Mart Stores had a strong motive to conspire with Netflix. In addition to its
7  interests as the 100% owner of Walmart.com, Wal-Mart Stores had further incentives to enter into
8  the Market Allocation Agreement, since it obtains substantial revenues from sales of new DVDs,
9  as well as store traffic resulting in the sales of other goods, which would have been threatened by
10 Netflix's entry into new DVD sales, and which were enhanced by Netflix's promotion of Wal-Mart
11 Stores and Walmart.com through the Market Allocation Agreement.

12      14.    In a letter submitted in connection with a prior antitrust case brought against Netflix
13 by other plaintiffs for other alleged violations of law, an assistant general counsel of Wal-Mart
14 Stores, referring specifically to Wal-Mart Stores, wrote of "Wal-Mart's decision to discontinue
15 renting DVDs." Moreover, it was Wal-Mart Stores that announced in part the Market Allocation
16 Agreement, which identifies Wal-Mart Stores, in the "About" section of the press release. The
17 announcement quoted John Fleming, at the time both the Chief Marketing Officer of Wal-Mart
18 Stores and the outgoing CEO of Walmart.com still overseeing Walmart.com operations, regarding
19 the Agreement. It explained that Walmart.com's DVD sales are in fact Wal-Mart Stores' "online
20 movie sales business," and that, more generally, Wal-Mart Stores' "[o]nline merchandise sales are
21 available at www.walmart.com."

22      15.    Whenever this Complaint refers to a statement or transaction of any corporation or
23 entity, the allegation means that the corporation or entity acted by or through its directors,
24 members, partners, officers, employees, affiliates, or agents, while engaged in the management,
25 direction, control, or conduct of the corporation's or entity's business and acting within its scope of
26 authority.

27

28

1

## JURISDICTION AND VENUE

2    16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332(d) &

3  1337 and 15 U.S.C. §§ 1-2, 15 & 26.

4    17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 15, 22 & 26 and pursuant

5  to 28 U.S.C. § 1391(b), (c) & (d), because at all times relevant to the Complaint: (a) Defendants

6  transacted business, were found, or acted through subsidiaries or agents present in this District; (b)

7  a substantial part of the events at issue in Plaintiff's claims occurred in this District; and (c) a

8  substantial portion of the affected interstate trade and commerce described below has been carried

9  out in this District.

10    18.    This Court has personal jurisdiction over Defendants because, *inter alia*, Netflix

11  and Walmart.com are headquartered in this State and each of the Defendants has transacted

12  business, maintained continuous and systemic contacts, purposefully availed itself of the benefits

13  of doing business, and committed acts in furtherance of the alleged conspiracy in this State.

14

## INTERSTATE TRADE AND COMMERCE

15    19.    Defendants' conduct has taken place within the flow of, and substantially affected

16  the interstate commerce of, the United States.  By way of example, Defendants have sold and/or

17  rented DVDs throughout the United States, involving hundreds of millions or billions of dollars in

18  interstate commerce, and used the instrumentalities of interstate commerce, including interstate

19  wires and the U.S. mail, to sell and/or to rent DVDs throughout the United States.

20

## RELEVANT MARKET

21    20.    For those claims that may require market definition, the Relevant Market for

22  purposes of these allegations during the Class Period at least is: the rental of DVDs online by

23  subscription for delivery by mail in the United States (the "Online DVD Rental Market").  At all

24  relevant times, Netflix has been a competitor in the Relevant Market.  Prior to entering into the

25  Market Allocation Agreement, Defendants Wal-Mart Stores and Walmart.com competed in the

26  Relevant Market.

27    21.    The Market Allocation Agreement, however, is *per se* illegal and requires no

28  allegation of market definition.

6

1    22.    Plaintiff also alleges, in the alternative, that the Market Allocation Agreement is
2  anticompetitive and illegal under the Rule of Reason.

3    23.    Among other facts alleged herein, the Defendants' conduct ended competition
4  between direct competitors in the Online DVD Rental Market, conferred market and monopoly
5  power upon Netflix in that market and has no pro-competitive benefits.

6    24.    "DVD," as defined herein, refers to a Digital Video Disc or Blu-ray Disc
7  containing commercially recorded entertainment programs for personal viewing. DVDs are the
8  primary medium by which movies and other recorded entertainment are distributed in the United
9  States. Revenues on DVDs far exceed those generated from box office receipts. In addition,
10  DVDs have become a particularly lucrative means for the distribution of previously aired
11  television programs, surpassing even television syndication rights as a revenue stream in many
12  instances. As defined herein, "DVD" does not refer to blank Digital Video Discs, which are used
13  to store or record data.

14    25.    At all relevant times, there have been no reasonably interchangeable substitutes for
15  the service of online DVD rentals, which is differentiated, from both the demand and the supply
16  side, from other methods of DVD distribution channels, as well as other methods of entertainment
17  content delivery.

18    26.    In the Online DVD Rental Market, for a monthly subscription fee, a consumer may
19  rent DVDs from an online service provider, such as Netflix, Blockbuster Online, or (prior to its
20  exit from this market) Wal-Mart DVD Rentals. Within any given plan, the consumer pays the
21  subscription fee regardless of how many DVDs he or she rents per month. Thus, even a consumer
22  who does not rent a DVD for months still is charged the subscription fee; Netflix CEO Reed
23  Hastings has called this the "gym membership effect." To rent DVDs, consumers fill out a rental
24  "queue" in their online profile, listing in order of preference the DVDs they wish to rent. The
25  DVDs are then sent to the consumer's home via U.S. mail. To return the DVD and receive the
26  next DVD in the queue, the consumer inserts the DVD in a prepaid envelope provided with the
27  rental and mails it back; the service provider then mails the next available movie in the queue to
28  the consumer.

1    27.    From the consumer's perspective, online DVD rentals are a differentiated service

2    that is not reasonably interchangeable with in-store video rental. In video rental from stores,

3    consumers drive to or otherwise arrive at the store, find (or do not find) what they are looking for,

4    and, for the most part, pay on a per-DVD basis for their selection(s). After the designated rental

5    period, usually depending upon the release date of the DVD, the consumer returns the selection or

6    potentially incurs late fees. During the Class Period as alleged herein, these late fees have

7    accounted for as much as 20% of the revenues in traditional video rental stores; there are no late

8    fees or due dates in the Online DVD Rental Market.

9    28.    There are numerous other practical indicia of the Online DVD Rental Market being

10   a relevant product market, distinct from other forms of video rental, including:

11           **A.    Price Competition.** No direct price competition exists between

12   online DVD rental and other forms of video rental, whether in-store, kiosk, video-on-demand, or

13   video downloading, which are not reasonably interchangeable with online DVD rental. For

14   example, online DVD rentals generally are priced on a monthly subscription basis. Within any

15   given plan, the subscription rate is independent of the number of DVDs the customer actually rents

16   in a month. In-store DVD rentals, kiosks, and downloading generally are priced on a pay-per-view

17   basis. Also, changes in the price of online rentals do not closely track changes in the price of in-

18   store rentals. The pricing of online DVD rentals is generally nationwide in scope and is not

19   affected by local in-store prices and competition. As a result, the pricing of online DVD rentals

20   would generally be the same to a customer, regardless of whether the nearest rental store is two

21   minutes or two hours away. Online DVD rentals generally offer additional services, such as movie

22   reviews, customer-specific recommendations based on viewing and preference history, and other

23   metrics of popularity. The cross-elasticity of demand between these products and services is such

24   that a small but significant non transitory increase in price ("SSNIP") would not cause consumers

25   to switch from online DVD rental to in-store rental or any other arguable method of DVD or video

26   distribution, and *vice versa*.

27           **B.    Functional Differences.** Online DVD rentals fundamentally differ

28   from in-store rentals in that (1) they do not require travel to a store (including a second trip to

8

1    return the DVD and potentially multiple trips if the store does not have the DVD in stock at the

2    right time), (2) are available to anyone with a postal address, regardless of proximity to a store, (3)

3    are primarily subscription-based services, and (4) provide a much wider selection of titles than can

4    a bricks-and-mortar store—the library of titles available from online service providers has grown

5    over time, now ranging beyond 100,000 DVDs—often twenty to one-hundred times the selection

6    of titles stocked (not to mention available) at any single video rental store. For these reasons,

7    among others, online and in-store DVD rentals are not reasonably interchangeable. Likewise,

8    other modes of video distribution, such as kiosk, video-on-demand, and downloading, among other

9    forms, are not reasonably interchangeable with online DVD rentals for a number of reasons,

10   including relative selection and convenience for consumers, pricing, as well as, from the supply

11   perspective, licensing considerations and technological limitations.

12           **C.    Public and Industry Perceptions.** The online rental market is recognized

13   as a distinct market by the public and the industry, including by Defendants. For example,

14   Defendants have confirmed and recognized the existence of a discrete online rental market. In

15   September 2008, Netflix spokesman Steve Swasey told the Wall Street Journal that other types of

16   rental services, such as kiosk and in-store rentals, do not present a direct competitive threat to

17   Netflix explaining, "We see kiosks as competing with video stores. They're very new-release

18   centric—that's all they offer—and that's what the stores offer. You're still going to a destination

19   to pick it up, you have to return it, and you pay by the day." Mr. Swasey acknowledged that while

20   video downloads may be a competitive force in the future, "[m]ainstream consumers are still happy

21   with DVDs, and probably will be for five to 10 years."

22           29.    As recently as April 24, 2009, during Netflix's First Quarter conference call with

23   financial analysts, Hastings said that online DVD and Blu-ray rental will "continue to grow for

24   many years," without regard to any advances in video downloading or other modes of content

25   delivery. Hastings went to explain that the "key takeaway" is that "there is still a lot of growth in

26   rental by mail. The studios clearly have a vested interest in extending the life of DVD and Blu-ray

27   and that's good for Netflix as well." Indeed, Hastings observed video kiosks pose no serious

28   competitive threat to Online DVD Rental, explaining that "Despite kiosk growth . . . we had a

1  record quarter and we expect to have a record year because our differentiators continue to be our

2  vast selection—over 100,000 titles—the convenience of mail and streaming, that you don't have to

3  drive anywhere to receive or return a Netflix disk, and our unlimited rentals for one flat fee."

4        30.     Online DVD rentals are also a separate market from DVD sales. The pricing of

5  DVD sales and online DVD rentals are very different. For example, the price to buy a new DVD

6  depends heavily on how popular it is, including whether it is a new release or how successful the

7  title originally was at the box office or on television. By contrast, online DVD renters generally

8  charge based on a subscription fee, regardless of whether the consumer is renting popular or

9  obscure DVDs. The industry and the public perceive online DVD rentals as separate from DVD

10  sales, whether in-store or online. The factors motivating a consumer to buy a DVD are different

11  from those that lead to renting a DVD. The former generally applies to DVDs that the consumer

12  intends to view (either personally, or their family or friends) numerous times. The latter generally

13  applies to DVDs that the consumer intends to view once and then return. DVDs sold at retail have

14  other distinguishing characteristics, such as packaging and special features not available with

15  rentals, which are delivered unadorned in envelopes. In addition, the fact of whether a DVD is

16  new or used is not an issue in rental, but is a significant factor in sales, for used DVDs are sold at a

17  significant discount to their new counterparts. DVD sales and online rentals also are not

18  reasonably interchangeable for consumers intending to collect physical DVDs or to give a DVD as

19  a gift. The cross-elasticity of demand between these products and services is such that a SSNIP

20  would not cause consumers to switch from online renting to purchasing DVDs, and *vice versa*.

21        31.     The Geographic Market for the Online DVD Rental Market is the United States.

22  The United States is the only area of effective competition where buyers can turn for alternative

23  sources of supply of Online DVD Rental services. Among other things, shipping costs and

24  transglobal differences in DVD data encoding make it neither practical nor feasible for entities

25  located in other countries to rent DVDs to U.S. consumers.

26                             **MARKET AND MONOPOLY POWER**

27        32.     At all relevant times, Netflix dominated the Online DVD Rental Market. Netflix

28  has had an approximate market share of 75% in the Online DVD Rental Market, and is far and

away the market leader in the Online DVD Rental Market. As a result of this market share, Netflix has had, and continues to have, market and monopoly power in the Online DVD Rental Market; it has the power to control prices or exclude competition in this Relevant Market.

33. Netflix also has the power to control prices or exclude competition in the Relevant Market for other reasons. Specifically, Netflix (a) set subscription prices well in excess of marginal costs, (b) enjoyed high profit margins thereon, (c) sold such subscriptions generally in excess of the competitive price, and (d) would not, with a SSNIP for its online DVD rental subscriptions (or not reducing its prices to match Blockbuster's lower prices during the Class Period), lose sufficient sales to make such a price increase unprofitable.

34. Netflix's market and monopoly power is strengthened by the significant barriers to entry in the Relevant Market. There have been no significant market entrants in the nearly six years since the announcement of the Market Allocation Agreement, which increased those barriers. Online DVD rental is highly capital intensive. A firm must operate on a large scale to be successful. It requires the possession of a significant number of shipping facilities strategically located throughout the United States to ensure timely delivery. It also requires stocking an extensive inventory of DVDs to maintain the selection of titles that consumers demand. As Netflix CEO Reed Hastings observed, "When you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can open a website. But the barriers to profitability are very large." Hastings further noted that "opening a website that does rental is easy. What's hard is [creating] the scale to be able to do it profitably." These barriers are far greater now that they were when Netflix began. Netflix was able to enter on a much smaller scale but a new entrant today would need a much larger scale of operations.

35. Since the implementation of the Market Allocation Agreement, the Online DVD Rental Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster, which possesses nearly all of the remaining 25% of the Online DVD Rental Market that Netflix does not control. Blockbuster's presence does not preclude Netflix's monopoly and market power. Reed Hastings has stated that Blockbuster actually "works very well for us" because it creates "a lot of press" but, from a competitive perspective, it has a "relatively not strong balance sheet and

11

1  [is] in the business in a small way." A few minor firms have shares of less than 1-2% of the

2  market. During fiscal years 2005-2008 combined, Netflix earned more than $5 Billion in revenues

3  and nearly $2 Billion in gross profit from renting DVDs to consumers—a margin of nearly 40%.

4  As a result of Netflix's market and monopoly power alleged herein, its subscription fees have been

5  higher than they otherwise would have been.

6      36.    Further evidence of Netflix's market and monopoly power is reflected in the

7  anticompetitive effects alleged herein.

8  ## THE ILLEGAL AGREEMENT

9      37.    **Pre-Agreement Competition in the Online DVD Rental Market.** In early 2005,

10  Netflix was coming off a year in which competition was growing and its stock price had dropped

11  precipitously. It faced increasing competition from Wal-Mart DVD Rentals and from Blockbuster

12  Online, the latter of which had just entered the Online DVD Rental Market.

13      38.    By mid-2004, Netflix was charging $21.99 for its most popular subscription rental

14  plan. Blockbuster entered the online market in earnest in August, at first charging $19.99 but then

15  reducing its price in November to $17.49 for its similar plan. After that, the Wal-Mart DVD

16  Rentals rate was reduced from $18.86 to $17.36. In the wake of these price cuts, Netflix reduced

17  its prices by nearly 20% to $17.99 per month. After that, Blockbuster further decreased its price to

18  $14.99—20% below Netflix's already reduced price and more than 40% below the price Netflix

19  was charging just months earlier.

20      39.    Meanwhile, Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which

21  had established themselves as the leader in new DVD sales, were facing increasing competition

22  from in-store and online channels of distribution in new DVD sales, including competition from

23  Amazon.com. At the time, Netflix was a significant potential additional competitor, since it had a

24  subscriber base of millions of customers who were also known to be prolific DVD buyers, and the

25  sales and profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new

26  DVDs to these customers. Conversely, Wal-Mart Stores and Walmart.com stood to gain

27  significant additional sales and profits and to gain further market share in the sale of new DVDs if

28  these customers were to make their purchases of new DVDs from them instead.

12

1     40.    **Walmart.com's success and plans for the online DVD rental business prior to**

2 **the Agreement**. From its beginnings in 2003 through the January 2005 dinner, Walmart.com

3 trumpeted the success of its online DVD rental service. As early as November 2003, Cynthia Lin,

4 a spokeswoman for Walmart.com, observed that "Customers have really been responsive to the

5 convenience of ordering online. . . . There's definitely a large appetite for this." And, in February

6 2004, Walmart.com said it was "seeing superb growth" in Wal-Mart DVD Rentals. By April 2004,

7 Walmart.com said its gains in monthly subscribers were "exceeding expectations." On October

8 24, 2004, only a few months prior to the January dinner, Kevin Swint, Walmart.com's director of

9 entertainment and photo said that Wal-Mart DVD Rentals had "grown beyond our expectations"

10 and that "We're really bullish about this service . . . and our customers are enthusiastic."

11     41.    The recognition of the potential of its DVD rental business also was reflected in the

12 dramatic expansion of Wal-Mart DVD Rentals during 2004 by the doubling of its capacity and

13 expressions of plans to continue that expansion in 2005. During 2004, for instance, Wal-Mart

14 DVD Rentals expanded its DVD selection from 13,000 titles to 20,000 and doubled the number of

15 distribution centers from 7 to 14. In December 2004, Amy Colella, a spokeswoman for

16 Walmart.com, said that the business was going to add even more distribution centers the following

17 year. As Colella explained on December 29, 2004: "It's a viable business for us, with growth

18 potential." During a January 7, 2005 interview, within days of the January dinner of CEOs

19 Hastings and Fleming, Walmart.com CEO John Fleming told CNBC that Wal-Mart DVD Rentals

20 was among its "very good businesses that we're focused on developing over the next year or two."

21     42.    **The Wal-Mart DVD Rentals Price Cut.** On that same day, January 7, 2005, Wal-

22 Mart DVD Rentals dropped the price on its most popular DVD rental plan significantly—to $12.97

23 per month—creating further price pressure on Netflix to reduce its DVD rental prices. In order to

24 respond to the increased competition, Netflix would have been forced to lower its prices and

25 thereby reduce its profits. This increased competition was not good news for Netflix. "Since its

26 core business is online DVD rentals, Netflix might have been the company most threatened by

27 Wal-Mart's push into the sector," as one industry publication then noted. That publication further

28 explained, "Because of its size, buying power and agreements with movie distributors, Wal-Mart

13

1  could have put significant pricing pressure on Netflix over time, analysts said." This growing price

2  disparity plainly was not good news for Netflix, even though it was for consumers.

3       43.   **The January Dinner Meeting.** Faced with this increasing competition, Reed

4  Hastings, the Chairman and CEO of Netflix, called John Fleming, then the CEO of Walmart.com,

5  and invited him to dinner to discuss their companies' (then) competing businesses. Fleming

6  accepted the invitation; they met in January 2005, "started talking about how we could work

7  together" (according to Hastings), and embarked upon a scheme that would result in the Market

8  Allocation Agreement.

9       44.   **Hastings' Subsequent "Prediction."** On April 21, 2005, in Netflix's First Quarter

10  earnings call with financial analysts, held after the January dinner, but less than one month prior to

11  the public announcement of the Market Allocation Agreement, Hastings made plain the motive for

12  Netflix to conspire with Wal-Mart Stores and Walmart.com:

13         In terms of profitability over the coming years, the key issue is the number of major
           competitors. If there are only two major players, Blockbuster and Netflix, the
14         profitability may be substantial like other two-firm entertainment markets. If, on
           the other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major
15         competitors in online rental, then the profits would likely be small.

16  Hastings went on to "predict" on that conference call:

17         [T]he likely case is [that] online rental becomes a two-firm market over the coming
           years.

18       45.   **The Public Announcement.** On May 19, 2005, shortly after Fleming had been

19  promoted by Wal-Mart Stores from his position at Walmart.com in Brisbane to be the Chief

20  Marketing Officer of Wal-Mart Stores in Bentonville, Defendants issued a joint press release that

21  revealed the existence of the Market Allocation Agreement. By entering into the Market

22  Allocation Agreement, Defendants unlawfully divided and allocated the markets for DVD sales

23  and rentals, and did, in fact, create the two-firm market that Hastings sought. Recognizing the

24  tremendous benefits that this improper agreement would bring to them, Hastings admitted that

25  "This agreement bolsters both Netflix's leadership in DVD movie rentals and Wal-Mart's strong

26  movie sales business."

27       46.   **The Media's Reaction.** The news of the agreement was featured in a number of

28  newspapers and other publications, in articles with aptly colorful titles, such as:

14

- "Wal-Mart and Netflix Scratch Each Other's Backs,"

- "Truce in DVD-Rental Wars,"

- "Wal-Mart and Netflix: An Alliance," and

- "Wal-Mart Loves Netflix: And Vice-Versa."

47.    **The Execution.** Beginning on May 19, 2005, Walmart.com, as agreed, did in fact exit the Online DVD Rental Market. Walmart.com announced to all of the subscribers to Wal-Mart DVD Rentals that it was exiting the Relevant Market and that those subscribers could be transferred to Netflix. Walmart.com took additional steps to affirmatively implement the Market Allocation Agreement by adding a prominently placed link to the Netflix website to encourage customers to transfer their subscriptions to and otherwise rent from Netflix. Since the date of their joint announcement on May 19, 2005 (apart from the 30 days that Walmart.com used to wind down its existing online rental business), neither Walmart.com nor Wal-Mart Stores has participated in the Online DVD Rental Market, and Netflix has not sold new DVDs.

48.    As a result of the Market Allocation Agreement, downward pricing pressure from Walmart.com was eliminated and the Online DVD Rental Market was reduced to two competitors. Absent the Market Allocation Agreement, Netflix would have lowered its prices no later than May 19, 2005. As a result of the elimination of a competitor in this Relevant Market, Netflix was able to hold its subscription rate steady at $17.99 per month and its only competitor left, Blockbuster, was able to raise its subscription price in July to match that of Netflix, from $14.99 per month to $17.99 per month. This was in accord with Hastings' expectation that "[i]f there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets." As one business publication proclaimed: "That's one less competitor for the DVD rental pioneer . . . . Now it looks like the competitive storm is dying down." In Netflix's next earnings call, on July 25, 2005, Hastings boasted:

> Last quarter we said online rental was shaping up to be a two-player market, and that is indeed what is happening.

49.    The Market Allocation Agreement was not in the independent self-interest of Wal-Mart Stores, Walmart.com, or Netflix. Neither Wal-Mart Stores nor Walmart.com would have

15

1   wanted Walmart.com to withdraw from the online rental market, encourage its subscribers to be

2   transferred to Netflix, and promote Netflix's rental business absent substantial consideration from

3   Netflix, such as an agreement not to compete for new DVD retail sales. But for the Market

4   Allocation Agreement, Walmart.com would not have exited the Online DVD Rental Market when

5   it did. Likewise, Netflix would not have foreclosed its opportunity to sell DVDs to its millions of

6   subscribers—a base of customers who purchase on average 25 DVDs per year each—and would

7   not have promoted new DVD sales by Wal-Mart Stores and Walmart.com, rather than its own

8   sales, absent an agreement from them not to compete against Netflix's online rental business.

9       50.     Walmart.com's exit from the Online DVD Rental Market was not a unilateral

10  decision. It was a key element of the Market Allocation Agreement as set forth herein. First,

11  Walmart.com's exit was expressly part of the Market Allocation Agreement with Netflix that

12  directly stemmed from the meeting between the two companies' CEOs. Prior to that Agreement,

13  Walmart.com had not announced anything about exiting this market. Second, as detailed above,

14  shortly prior to the January dinner Walmart.com repeatedly described its success in the online

15  DVD rental business and expressed its intention to continue and expand in that business. Its

16  conduct after the January meeting thus represents a sudden and sharp reversal in its plans. Third,

17  Walmart.com cut its price shortly before the January dinner. It would not have done so had it

18  planned to exit the Online DVD Rental Market. Such a price cut only makes sense if

19  Walmart.com planned to remain a long-term competitor in that market. Fourth, the fact that the

20  dinner was initiated by Reed Hastings right around the time of Walmart.com's price cut and

21  numerous announcements of its intention to continue and expand its online DVD rental business,

22  contradicts any assertion that the dinner stemmed from a unilateral decision by Walmart.com to

23  exit the market.

24      51.     **Single agreement**. The conduct alleged herein constitutes a single overarching

25  conspiracy consisting of both the terms that were publicly announced as well as the other aspects

26  of the Market Allocation Agreement.

27                          **ANTICOMPETITIVE EFFECTS**

28      52.     Defendants' illegal acts and practices have caused anticompetitive effects in the

16

1 | Online DVD Rental Market. The subscription fees charged by Netflix to Plaintiff, as well as the
2 | other members of the Class, were maintained at artificially high and supracompetitive levels.
3 | Plaintiff and the other members of the Class paid higher subscription prices to Netflix than they
4 | otherwise would have paid. As one industry publication reported at the time of the Agreement,
5 | "[b]ecause of its size, buying power and agreements with movie distributors, Wal-Mart could have
6 | put significant pricing pressure on Netflix over time, analysts said."

7 | 53. The Market Allocation Agreement (i) eliminated one of only three significant
8 | competitors in the Relevant Market, (ii) eliminated competition between Defendants, and (iii)
9 | enabled Netflix to acquire market power and also acquire and maintain monopoly power in the
10 | Relevant Market. The Market Allocation Agreement has enabled Netflix to implement
11 | monopolistic and supracompetitive pricing in the Relevant Market.

12 | 54. **The Market Allocation Agreement and Defendants' acts and practices in**
13 | **furtherance thereof have no procompetitive benefits.** The co-promotion aspects of the
14 | Agreement do not create information that consumers need, nor do they create new or better
15 | products or services. Rather, they have served to reinforce the true anticompetitive nature of the
16 | Market Allocation Agreement by assuring, for example, that Walmart.com not only withdrew from
17 | the Online DVD Rental Market, but further enhanced Netflix's position in that market. Even if
18 | there were any such benefits, they would not outweigh any of the anticompetitive effects described
19 | herein, and, in any event, could be achieved by less restrictive means.

20 | 55. Defendants' market allocation scheme is a naked restraint of trade; it was not and is
21 | not ancillary to any legitimate business collaboration. Rather, the market allocation scheme was a
22 | core activity of the Market Allocation Agreement itself. The co-promotion aspects of the
23 | Agreement were a means to reinforce the market allocation. To the extent that those aspects were
24 | portrayed as the sole reason for the Market Allocation Agreement, that portrayal was misleading
25 | and pretextual, allowing Defendants' market allocation conspiracy to escape scrutiny and "hide in
26 | plain sight."

27 | **CLASS ACTION ALLEGATIONS**

28 | 56. Plaintiff brings this action on his own behalf and as a class action under Rules

17

1  23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all members of

2  the following Class:

> Any person or entity in the United States that paid a subscription fee to Netflix on or after May 19, 2005 up to and including the date of class certification.

> Excluded from the Class are government entities, Defendants, their co-conspirators, Reed Hastings, John Fleming, Defendants' subsidiaries, corporate affiliates, and counsel in this action. Also excluded are persons who subscribed to Wal-Mart DVD Rentals as of May 19, 2005. Also excluded are the Judge presiding over this action, her law clerks, her spouse, or any person within the third degree of relationship to either of them, or the spouse of such a person, within the meaning of 28 U.S.C. § 455.

57.     The Class numbers in the millions, the exact number and identities of the members being known by Defendants.

58.     The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

59.     There are questions of law and fact common to the Class and the members thereof. These common questions relate to the existence of the conspiracy alleged, and to the type and common pattern of injuries sustained as a result thereof. The questions include, but are not limited to:

a.     Whether Defendants engaged in a contract, combination, or conspiracy to allocate markets;

b.     Whether Defendants unreasonably restrained trade in the Online DVD Rental Market;

c.     Whether Defendants had the specific intent for Netflix to monopolize the Online DVD Rental Market;

d.     The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, and conspiracy;

e.     Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

f.     Whether the alleged contract, combination, and conspiracy and other conduct violated Section 2 of the Sherman Act;

g.     The anticompetitive effects of Defendants' violations of law;

h.     Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or

18

1   corresponding declaratory relief with respect to the Class as a whole; and

2       i.    Whether the conduct of Defendants, as alleged in this Complaint,
3   caused Netflix subscription fees to be higher than they otherwise would
    have been and thereby caused injury to the business and property of
4   Plaintiff and other members of the Class.

5   60.    The questions of law and fact common to the members of the Class predominate

6   over any questions affecting only individual members, including the legal and factual issues

7   relating to liability and damages.

8   61.    Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of

9   other members of the Class, and they will fairly and adequately protect the interests of the

10  members of the Class. Their interests are aligned with, and not antagonistic to, those of the

11  other members of the Class.

12  62.    Plaintiff is represented by counsel who are competent and experienced in class

13  action antitrust litigation.

14  63.    A class action is superior to other available methods for the fair and efficient

15  adjudication of this controversy. Class treatment will permit the adjudication of relatively small

16  claims by members of the Class who otherwise could not afford to litigate antitrust claims such as

17  are asserted in this Complaint. This class action presents no difficulties of management that would

18  preclude its maintenance as a class action.

19  **ANTITRUST INJURY AND STANDING**

20  64.    During the Class Period, Plaintiff and the members of the Class have directly paid

21  monthly DVD subscription fees to Netflix in the United States, and many continue to do so.

22  65.    Plaintiff and the members of the Class have suffered, and many continue to suffer,

23  injury of the type that the antitrust laws are designed to punish and prevent. Plaintiff and the

24  members of the Class have paid, and many continue to pay, more to subscribe to Netflix than they

25  would have, absent the Market Allocation Agreement. As a direct and proximate result of the

26  unreasonable restraint of trade and market and monopoly power created by the Market Allocation

27  Agreement, which is continuing to this day, Plaintiff and the members of the Class were, and many

28  continue to be, injured and financially damaged in their businesses and property, in amounts that

19

1  are not presently determined. As the direct victims of Defendants' antitrust violations, Plaintiff is

2  an efficient enforcer of the antitrust claims made herein.

3  **COUNT ONE**

4  **SHERMAN ACT SECTION ONE (15 U.S.C. § 1)**
**Market Allocation of Online DVD Rental Market**

5  **(Against All Defendants)**

6  66.    Plaintiff realleges each allegation set forth above, as if fully set forth herein.

7  67.    Defendants have entered into a per se illegal market division agreement, in violation

8  of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

9  68.    In the alternative, if evaluated under the Rule of Reason, the Market Allocation

10  Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust

11  Act, 15 U.S.C. § 1.

12  69.    Prior to and at the time of the agreement, Netflix and Walmart.com were actual

13  competitors in the Online DVD Rental Market. In addition, Netflix was a potential competitor of

14  Wal-Mart Stores and Walmart.com in new DVD sales. Wal-Mart Stores and Walmart.com were

15  actual participants and Netflix was a potential participant, with the means and economic incentive

16  to sell new DVDs—in the absence of the Market Allocation Agreement.

17  70.    Defendants shared a conscious commitment to a common scheme designed to

18  achieve the unlawful objective of allocating the markets for online DVD rentals and new DVD

19  sales. The Market Allocation Agreement allocated the Online DVD Rental Market to Netflix, with

20  Wal-Mart Stores and Walmart.com agreeing not to compete in that market. The agreement also

21  allocated new DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain

22  from selling new DVDs in competition with them.

23  71.    In addition to explicitly or *de facto* agreeing not to sell new DVDs, Netflix also

24  obtained the Market Allocation Agreement by providing potentially valuable promotion to Wal-

25  Mart Stores and Walmart.com. In so doing, Netflix provided significant consideration to Wal-

26  Mart Stores and Walmart.com for their agreement that Walmart.com would withdraw from, and

27  both Walmart.com and Wal-Mart Stores would not compete in, the Online DVD Rental Market.

28  72.    The Market Allocation Agreement has created significant anticompetitive effects

20

1   and no pro-competitive benefits. It eliminated competition in the Relevant Market, raising prices

2   paid by consumers. To the extent that there were any procompetitive benefits resulting from the

3   agreement, they would not outweigh the agreement's anticompetitive effects and could have been

4   achieved by less restrictive means.

5       73.    As a result of this violation of law, Netflix's subscription prices charged to, and

6   paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

7   **COUNT TWO**

8   **SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
9     **Monopolization of Online DVD Rental Market**
**(Against Netflix)**

10       74.    Plaintiff realleges each allegation set forth above, as if fully set forth herein.

11       75.    Netflix has monopoly power in the Online DVD Rental Market.

12       76.    Netflix willfully acquired and maintained its monopoly in the Online DVD Rental

13   Market by its acts and practices described herein, including by executing, implementing, and

14   otherwise complying with the Market Allocation Agreement, in violation of Section 2 of the

15   Sherman Antitrust Act, 15 U.S.C. § 2. That monopolization was achieved or strengthened through

16   restrictive or exclusionary conduct, rather than by means of superior business acumen. It was

17   Netflix's conscious object to further its dominance in the relevant market by and through the

18   Market Allocation Agreement.

19       77.    As a result of this violation of law, Netflix's subscription prices charged to, and

20   paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

21   **COUNT THREE**

22   **SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
**Attempt to Monopolize Online DVD Rental Market**
23   **(Against Netflix)**

24       78.    Plaintiff realleges each allegation set forth above, as if fully set forth herein.

25       79.    If Netflix does not already have monopoly power, then Netflix has a dangerous

26   probability of success in achieving monopoly power in the Online DVD Rental Market.

27       80.    With the specific intent to achieve a monopoly, Netflix, by its acts and practices

28   described herein, including by executing, implementing, and otherwise complying with the Market

21

1 Allocation Agreement, has attempted to monopolize the Online DVD Rental Market, in violation

2 of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. It was Netflix's conscious object to

3 control prices and/or exclude competition in the relevant market.

4    81.    As a result of this violation of law, Netflix's subscription prices charged to, and

5 paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

6                                    **COUNT FOUR**

7                          **SHERMAN ACT SECTION TWO (15 U.S.C. § 2)**
                          **Conspiracy to Monopolize Online DVD Rental Market**
8                                 **(Against All Defendants)**

9    82.    Plaintiff realleges each allegation set forth above, as if fully set forth herein.

10   83.    Defendants shared a conscious commitment to a common scheme designed to

11 achieve the unlawful objective of the monopolization of the Online DVD Rental Market. Prior to

12 and at the time of the Agreement, Netflix and Walmart.com were actual competitors in that market.

13 Defendants conspired with the specific intent, knowledge and purpose that their anticompetitive

14 agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Relevant

15 Market. Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the

16 Market Allocation Agreement would be the monopolization of the Relevant Market by Netflix.

17 Defendants have committed overt acts in furtherance of their conspiracy, including entering into,

18 complying with, and implementing the Market Allocation Agreement, in violation of Section 2 of

19 the Sherman Antitrust Act, 15 U.S.C. § 2.

20   84.    As a result of this violation of law, Netflix's subscription prices charged to, and

21 paid by, Plaintiff and the Class are, and have been, higher than they otherwise would have been.

22                                **PRAYER FOR RELIEF**

23   WHEREFORE, Plaintiff respectfully requests that:

24       A.    The Court determine that this action may be maintained as a class action
                under Rule 23 of the Federal Rules of Civil Procedure and that Plaintiff be
25              appointed a class representative.

26       B.    Defendants be adjudged to violate Sections 1 and 2 of the Sherman Antitrust
                Act, 15 U.S.C. §§ 1-2.
27
         C.    The Court declare the Market Allocation Agreement between Defendants
28              announced May 19, 2005, to be unlawful and null and void.

                                         22

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D.   Judgment be entered for Plaintiff and the members of the Class against Defendants, jointly and severally, for three times the amount of damages sustained by Plaintiff and the Class, under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, together with the costs of the action, including reasonable attorneys' fees, and such other relief as is appropriate.

E.   Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect, pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

F.   Plaintiff and the members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

1

**JURY DEMAND**

2

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial of all

3

issues triable by jury.

4

Dated: April 19, 2011

5

Craig C. Corbitt (83251)
Michael S. Christian (212716)

6

ZELLE HOFMANN VOELBEL &
MASON LLP

7

44 Montgomery Street, Suite 3400
San Francisco, CA 94104

8

Telephone: (415) 693-0700
Facsimile: (415) 693-0770

9

ccorbitt@zelle.com
mchristian@zelle.com

10

*Counsel for Plaintiff*

11

12

13

3224279v1

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

CLASS ACTION COMPLAINT